ESTATE OF SAMUEL STEIN, DECEASED, LAZARUS I. LEVINE AND NORMAN L. MARKS, EXECUTORS, AS ALLEGED TRANSFEREE OF ESTATE OF ESTHER M. STEIN, DECEASED, AS ALLEGED TRANSFEREE OF NATIONAL THREAD CO., INC., TRANSFEROR, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 69931, 69932, 70277, 78991.   Filed February 21, 1962.

---

[1] Proceedings of the following petitioners are consolidated herewith: Estate of Samuel Stein, Deceased, Lazarus I. Levine and Norman L. Marks, Executors, as Alleged Transferee of National Thread Co., Inc., Transferor, Docket No. 69932; Estate of Samuel Stein, Deceased, Lazarus I. Levine and Norman L. Marks, Executors, as Alleged Transferee of Estate of Esther M. Stein, Deceased, Transferor, Docket No. 70277; and Estate of Samuel Stein, Deceased, Lazarus I. Levine and Norman L. Marks, Executors, as Alleged Transferee of Estate of Esther M. Stein, Deceased, Transferor, Docket No. 78991.

*Joseph Getz, CPA*, and *Murray L. Brinn, Esq.*, for the petitioners. *William G. O'Neill, Esq.*, and *John A. Dunkel, Esq.*, for the respondent.

## OPINION.

FORRESTER, *Judge:* Respondent has determined liabilities against the petitioners as transferees as follows:

| Docket No. | Description | Amount (excluding interest) |
|---|---|---|
| 69931 | Transferee of Estate of Esther M. Stein, as Transferee of National Thread Co., Inc. | $59,548.05 |
| 69932 | Transferee of National Thread Co., Inc. | 115,167.41 |
| 70277 | Transferee of Estate of Esther M. Stein (1943 tax and addition to tax) | 58,135.71 |
| 78991 | Transferee of Estate of Esther M. Stein (1944 tax) | 766.04 |

The issues for consideration are as follows:

(1) Is respondent estopped to assert transferee liability in Docket Nos. 69931 and 69932 by reason of an "election" to treat the transfers involved therein as taxable distributions in prior cases?

(2) Were certain transfers by the National Thread Co., Inc., to its shareholders during the years 1943 to 1946, inclusive, and the transfer from Esther's estate involved in Docket Nos. 69931, 70277, and 78991 made with intent to hinder, delay, or defraud the United States in the determination, assessment, and collection of deficiencies in and additions to taxes due?

(3) In the alternative as to Docket Nos. 69931 and 69932, were the above transfers from National Thread Co., Inc., or some of them, made while said company was insolvent or thereby being rendered insolvent?

(4) In the alternative, did transfers by National Thread Co., Inc., in the amount of $10,000 to Samuel Stein impair the transferor's capital so as to render the transferee liable under the provisions of section 58 of the New York Stock Corporation Law?

(5) If respondent is not found in Issue 1 to be estopped in Docket No. 69932, is petitioner entitled to equitable recoupment therein for certain income taxes paid by Samuel Stein?

(6) In what manner is the amount of $74,880.91 received by Samuel Stein from the Estate of Esther M. Stein allocable to the dockets in which petitioner has been determined to be a transferee of said estate, namely Docket Nos. 69931, 70277, and 78991?

(7) At what rate and from what date is petitioner liable for interest on the several transfers?

All of the facts have been stipulated, are so found, and are incorporated herein by this reference. In prior proceedings, reported at 25 T.C. 940 [2] (hereinafter referred to as the prior cases), we determined deficiencies in tax and additions to tax for fraud against National Thread Co., Inc. (hereinafter referred to as NTC), Samuel Stein, and the Estate of Esther M. Stein, Deceased. The decisions were entered on August 21, 1956, and have since become final. The findings of fact and opinion in the prior cases are incorporated by reference as if fully rewritten here.

In accordance with the decisions in the prior cases, the deficiencies in taxes and additions thereto determined against NTC were as follows:

| Year | Income tax | Declared value excess profits tax | Excess profits tax | Additions to tax for fraud |
|---|---|---|---|---|
| 1943 | $320. 75 | $3, 088. 96 | $36, 373. 10 | $20, 357. 07 |
| 1944 | | 968. 42 | 26, 779. 97 | 13, 874. 20 |
| 9451 | 2, 596. 22 | 2, 469. 19 | 36, 353. 90 | 20, 709. 66 |
| Total | 2, 916. 97 | 6, 526. 57 | 99, 506. 97 | 54, 940. 93 |
| Grand total | | | | 163, 891. 44 |

A portion of NTC's deficiencies in taxes and additions thereto was paid subsequent to the death of Samuel Stein in 1956, but the following amounts (exclusive of interest as provided by law) remain unpaid as per the records of the district director of Manhattan:

| Year | Excess profits tax | Additions to excess profits tax for fraud |
|---|---|---|
| 1943 | $32, 636. 57 | $18, 186. 55 |
| 1944 | 25, 985. 95 | 13, 389. 99 |
| 1945 | 17, 251. 82 | 18, 176. 95 |
| Total | 75, 874. 34 | 49, 753. 49 |
| Total unpaid | | 125, 627. 83 |

[2] Affirmed per curiam sub nom. *Levine* v. *Commissioner*, 250 F.2d 798 (C.A. 2, 1958).

The following deficiencies were also determined in the prior cases:

| Year | Taxpayer | Deficiency in income tax | Additions to tax for fraud |
|------|----------|--------------------------|----------------------------|
| 1943 | Estate of Esther M. Stein, Deceased | $38,757.14 | $19,378.57 |
| 1944 | Samuel Stein | 10,110.63 | 5,055.32 |
| 1945 | Samuel Stein | 19,884.21 | 9,942.10 |

The deficiencies in income tax and additions thereto for fraud determined against Samuel Stein for the years 1944 and 1945 have been paid. Interest thereon to the extent of $1,545.27 and $188.48 has been paid on the liabilities for 1944 and 1945, respectively.

No part of the deficiency, addition to tax, or interest as provided by law thereon, determined against the Estate of Esther M. Stein, Deceased, for the year 1943 has been paid. After Esther's death on March 27, 1944, Samuel became the executor of her estate. On or about August 21, 1946, there was distributed to Samuel, as residual beneficiary under the will of Esther M. Stein, the amount of $74,880.91. By reason of this distribution the Estate of Esther M. Stein was left without assets and has continued so.

Docket No. 69931 involves the liability of Samuel's estate (he having died in 1956) as transferee of a transferee (Esther) of NTC. The amounts involved in this docket are the sums of $57,130.21 and $2,417.84 paid by NTC to Esther in 1943 and 1944, respectively. Petitioner in this docket is the estate of Samuel, and liability is predicated on his having received from Esther through her will funds of NTC which respondent seeks to apply toward NTC's tax liability.

Docket No. 69932 involves Samuel's liability as transferee of NTC. The sums received by him as determined in the prior cases are:

| Year received | Amount | Allocation of amount received made in Rule 50 computation pursuant to decision in the prior cases | | |
|---------------|--------|------------------|------------------|------------------|
| | | Ordinary income | Return of capital | Capital gain |
| 1944 | $35,673.54 | $12,188.48 | $10,000 | $13,485.06 |
| 1945 | 76,208.03 | 912.48 | | 75,295.55 |
| 1946 [1] | 3,285.84 | | | |
| Total | 115,167.41 | | | |

[1] The year 1946 was not before the Court in the prior cases.

The amount of $3,285.84 was received by Samuel from NTC in 1946 but was not reported by him on his income tax return filed for that year.

Docket No. 70277 involves Samuel's liability as transferee of Esther for her unpaid 1943 taxes and additions thereto amounting to

$58,135.71.  Transferee liability is predicated on Samuel's receipt of the residue of Esther's estate.  Petitioners concede that the funds so received are subject to respondent's claim, but deny liability for interest on such funds.  They also claim that all of these funds received from Esther's estate—$74,880.91—are due and owing in Docket No. 70277.

Docket No. 78991 involves the liability of Samuel as transferee of Esther for an agreed deficiency in income tax in the amount of $766.04, representing the tax on her income received in 1944 prior to her death. There is no addition to tax for fraud on this amount, which remains unpaid.  As in Docket No. 70277, transferee liability is predicated on the receipt by Samuel of the residue of Esther's estate.

Samuel Stein and Esther M. Stein were husband and wife residing in New York City.  They were married in 1908, and had no children.

Prior to May 1913, Esther's father conducted a sole proprietorship engaged in the business of selling trimmings and thread.  In May 1913 he incorporated this business, known thereafter as NTC, under the laws of the State of New York.  He owned 48 of the 50 original shares of capital stock.  By 1916, those 50 shares had been transferred to Esther, and an additional 50 shares had been issued to her with the result that Esther became the sole stockholder of NTC.  The par value and amount paid in for such stock was $10,000.  Although Samuel became president and treasurer of NTC in 1913, these positions were only nominal, and Esther was in complete charge of the business.

In 1923, NTC began manufacturing operations.  Included in these operations was converting mercerized and dyed yarn into lots of varying yardage and weights per the specification of customers, who were usually clothing manufacturers.  This was done in Hoboken, New Jersey, under the business name of Carolina Thread Mills, and was supervised by Samuel.

In 1935, Carolina's facilities were moved to New York City and absorbed by NTC.  At that time Samuel asked Esther to transfer some of her stock in NTC to him, but she refused, promising instead to pay him a share of the corporation's profits.  It was Esther's practice to give Samuel cash from NTC whenever he needed it.

In 1943, as a result of further discussions regarding Samuel's interest in the business, Esther converted most of her individual bank accounts into joint accounts with Samuel, giving him for the first time power to make withdrawals therefrom.  On January 27, 1944, Esther, who was then in poor health, gratuitously transferred all her stock in NTC to Samuel.  She died on March 27, 1944.

Esther remained active in the operations and policies of NTC until shortly before the transfer of her stock to Samuel.  Samuel through the years had been taking an increasingly larger part in the executive

functions of NTC, and by about 1942 was the more dominant of the two spouses. He was thus NTC's president and chief administrative officer in fact as well as in name.

During the years 1942 to 1945, inclusive, certain sales were made in the names of NTC, Samuel, and Carolina Thread Mills. None of the proceeds from these sales were reported by NTC or the Steins. Also, various "unexplained" or "unidentified" bank deposits were made by the Steins during this period. We determined in the prior cases that these sales were made by NTC and that a portion of the disputed bank deposits was attributable to such sales. All of the proceeds from these sales were either deposited in Samuel's and Esther's bank accounts, taken by them in cash, or entered to their credit on NTC's books. Primarily due to the failure to report this $178,936.88 in sales proceeds, we found that (1) the returns filed by NTC and by the estate of Esther for 1943 [3] were false and fraudulent with intent to evade tax, and (2) part of the deficiences determined against NTC for the years 1943, 1944, and 1945, part of the deficiency determined against the estate of Esther for the year 1943, and part of the deficiencies determined against Samuel for the years 1944 and 1945 were due to fraud with intent to evade tax.

The balance sheets of NTC as of December 31 of each of the taxable years 1942 through 1946 are as shown in the table below. They include liabilities for deficiencies in taxes and interest thereon, but exclude liabilities for the additions to tax for fraud.

NATIONAL THREAD COMPANY, INC.

Balance Sheets

| | Dec. 31— | | | | |
|---|---|---|---|---|---|
| | 1942 | 1943 | 1944 | 1945 | 1946 |
| Assets: | | | | | |
| Cash | $14,836.53 | $23,792.37 | $19,415.04 | $51,569.09 | $70,719.10 |
| Notes and accounts receivable | 76,581.61 | 58,006.69 | 48,143.03 | 21,189.49 | 54,874.78 |
| Inventories | 63,584.76 | 57,607.12 | 46,958.75 | 22,509.06 | 38,895.90 |
| Investments | | | 9,335.33 | 9,335.33 | 9,335.33 |
| Capital assets | 1,662.82 | 2,586.06 | 2,139.38 | 1,558.45 | 166.28 |
| Other assets: | | | | | |
| Sundry receivables | 3,650.94 | 6,254.11 | | 12,561.52 | 6,439.98 |
| Postwar refund credit | | 3,637.31 | 3,637.31 | 3,637.31 | 3,637.31 |
| Overpayment of income tax | | | 813.82 | 813.82 | 813.82 |
| Total assets | 160,316.66 | 151,883.66 | 130,442.66 | 123,174.07 | 184,882.50 |
| Liabilities: | | | | | |
| Accounts payable | 51,780.50 | 44,543.00 | 32,800.67 | 16,604.48 | 68,729.54 |
| Bonds, notes, mortgages payable | 20,000.00 | 16,000.00 | | 14,000.00 | |
| Accrued expenses: | | | | | |
| Taxes | 4,299.18 | 43,572.57 | 74,455.98 | 114,553.50 | 124,858.02 |
| Other | 3,869.84 | 3,762.12 | 2,461.73 | 5,354.82 | 9,350.48 |
| Other liabilities: | | | | | |
| Loans and exchanges | | | 218.48 | | |
| Due to officers | 10,821.80 | 6,674.08 | | | |
| Capital stock | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 |
| Earned surplus | 59,545.34 | 27,331.89 | 10,505.80 | (37,338.73) | (28,055.54) |
| Total liabilities, capital, and surplus | 160,316.66 | 151,883.66 | 130,442.66 | 123,174.07 | 184,882.50 |

[3] Esther died before filing her 1943 return. Samuel, as executor of her estate, filed and signed an individual return for her for the year 1943.

The net equities of NTC at relevant times are as follows:

| Dec. 31— | Excess of assets over liabilities per balance sheet | Excess less additions to tax for previous years | Excess less additions to tax including that due on current year's deficiency |
|---|---|---|---|
| 1943 | $37,331.89 | $37,331.89 | $16,974.82 |
| 1944 | 20,505.80 | 148.73 | (13,725.47) |
| 1945 | (27,338.73) | (61,570.00) | (82,279.66) |
| 1946 | (18,055.54) | (72,996.47) | (72,996.47) |

On or about December 18, 1952, and on or about August 10, 1954, NTC submitted to the district director of internal revenue, Lower Manhattan District, a Form 433—"Statement of Financial Condition and Other Information." These were requested by respondent subsequent to his making of jeopardy assessments against NTC on November 5, 1952.

These forms did not include the jeopardy assessments among the liabilities, and revealed that NTC could not pay its tax liabilities.

Samuel Stein died on May 27, 1956.

NTC continued its business until May 9, 1957, at which time respondent, through the district director of internal revenue for the Lower Manhattan District, levied on NTC's assets for the nonpayment of some of the taxes and penalties involved herein and took possession of the corporate premises located at 256 West 36th Street, New York City.

The executors of the Estate of Samuel Stein first received written notice of the liabilities herein involved on the following dates and in the following manner:

Docket No. 69931—By 30-day letter dated May 23, 1957.
Docket No. 69932—By 30-day letter dated May 23, 1957.
Docket No. 70277—By statutory notice of liability dated July 24, 1957.
Docket No. 78991—By 30-day letter dated June 24, 1958.

No claims for refund have been filed with respondent for any of the taxes, additions thereto, or interest paid as a result of the decisions in the prior cases.

## Issue 1.

Petitioner contends that respondent is estopped from asserting transferee liability in Docket Nos. 69931 and 69932. Relying upon *United States* v. *Brown*, 86 F. 2d 798 (C.A. 6, 1936), he argues that respondent's decision in the prior cases to treat the payments to Esther and Samuel as taxable corporate distributions precludes his now treating them so as to establish transferee liability herein. Respondent should be bound, it is argued, by his election of one of two inconsistent positions.

Respondent denies any inconsistency, claiming that a distribution may be taxable to the distributees (even as a dividend) and still be fraudulent as to, and subject to being set aside by, creditors of the distributor. He contends that Esther and Samuel received their payments under a claim of right and were properly taxed thereon, but that such taxation does not preclude a subsequent assertion of transferee liability based on those payments, citing *Healy* v. *Commissioner*, 345 U.S. 278 (1953), applied by this Court in *Bennett E. Meyers*, 21 T.C. 331 (1953). Petitioner concedes that a subsequent determination of transferee liability does not preclude the receipt of taxable income, but maintains that the doctrine of election of remedies nevertheless is controlling.

Election of remedies is a choice between inconsistent rights. *Wm. W. Bierce, L'D* v. *Hutchins*, 205 U.S. 340 (1907). Estoppel and election are doctrines to be applied with caution against the United States. *Goldstein* v. *United States*, 227 F. 2d 1 (C.A. 8, 1955).

Petitioner puts great reliance on *United States* v. *Brown, supra.* In that case a corporation owing approximately $30,000 in back taxes made a dissolution distribution of all of its assets—approximately $215,000—to its three stockholders. Respondent subsequently instituted an equity suit in the District Court against the stockholders as transferees for the $9,000 of the corporation's deficiencies not barred by statute. During the pendency of that action respondent issued a statutory notice of deficiency to each stockholder, treating the distributions as taxable income. The Board of Tax Appeals sustained respondent, and denied the taxpayer's effort to deduct the potential transferee liability.

The District Court held respondent estopped by his action before the Board, and the Court of Appeals affirmed. The latter court found that had respondent pursued the transferee proceeding, the deficiencies determined in the proceeding before the Board would have been reduced by the amount of corporation taxes recovered. Respondent could have recovered the entire $9,000, but since he chose to recover only the tax on $9,000 included as dividend income in the transferees' gross income, he was bound by that choice.[4]

The *Brown* case was followed in *Vestal* v. *Commissioner*, 152 F. 2d 132 (C.A.D.C. 1945), but that case is inapposite here. *Vestal* estopped respondent because he had determined in one proceeding that a certain taxable person had made a sale, and the court refused to permit him to select another seller in a later proceeding. Were there such a clear inconsistency in the instant case, petitioner's position would be well taken.

---

[4] We have grave doubts whether the Court of Appeals would estop respondent from asserting that the distribution was a dividend had he first pursued the transferees and recovered from them the amounts owed by the transferor.

However, the Supreme Court has now decided a similar case, *Healy* v. *Commissioner, supra*. That case involved corporate salaries properly reported by the officers receiving them. Respondent determined a deficiency against the payor corporation resulting from the disallowance of parts of the salary payments as excessive. He then sought to recover from the officers as transferees, receipt of the excessive salaries being the basis for the asserted transferee liability. The taxpayers sought a deduction of the repayments in the year of receipt, but the Court sustained respondent and allowed only a loss deduction in the year when repayment was made.[5]

The Supreme Court had no difficulty reconciling the taxability as income with the subsequent transferee proceeding. It relied on two well-established principles of Federal income taxation: (1) Income received under a claim of right is taxable upon receipt, and (2) income is reported on an annual basis.

The claim-of-right doctrine, now firmly established in our tax law, first found expression in *North American Oil* v. *Burnet*, 286 U.S. 417, 424 (1932):

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. [Citations omitted.] If in 1922 the Government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. * * *

The Court in *Healy* held the salaries to have been received under claims of right and therefore not received for the benefit of creditors. The possibility of future transferee liability was held to be an insufficient restriction on use to avoid the claim-of-right theory.

The Court left undisturbed the taxes previously collected, stating that a contrary result would undermine the annual accounting system by disrupting orderly collection of revenue, by frequently barring adjustments favorable to taxpayers because of lapse of time, and by allowing subsequent events to be reflected in prior year's income. Therefore, the officers were allowed the loss deduction in the year of repayment.

We applied *Healy* in *Bennett E. Meyers, supra*, and we again affirm the principle that payments constituting taxable income in one accounting period can be the basis for transferee liability in a subsequent period. We conclude that such determinations are not inconsistent, that respondent is not estopped in Docket Nos. 69931 and 69932 by his treatment of the payments as taxable corporate

---

[5] This was the rule prior to the enactment of section 1341 in 1954. See the discussion of this point under Issue 5, *infra*.

distributions in the prior cases, and that the doctrine of election of remedies is inapplicable here.

## *Issues 2, 3, and 4.*

To sustain his determinations of transferee liability, respondent bears the burden of proof.[6] The existence of transferee liability is determined by State law. *Commissioner* v. *Stern*, 357 U.S. 39 (1958). Under the applicable State law transferee liability may be at law or in equity. *Estate of Harry Schneider*, 29 T.C. 940, 957 (1958).

Respondent predicates the transferee liability of petitioner upon section 276 of the New York Debtor and Creditor Law.[7] The applicability of this statute requires a finding that NTC and Esther's estate made the various transfers with an actual intent (as opposed to a presumed intent) to hinder, delay, or defraud the United States. We must therefore decide whether the transfers here in issue constituted fraudulent conveyances.

The test of a fraudulent conveyance is whether the debtor's transfers have caused a loss to the creditor by reason of leaving less to be seized and applied to the creditor's claim. There cannot be a fraudulent conveyance without a resultant diminution of the value of the assets or estate of the debtor available to creditors. *Newfield* v. *Ettlinger*, 22 Misc. 2d 769, 194 N.Y.S. 2d 670 (1959). However, a finding of preexisting or resultant insolvency is not essential to actual fraud in New York. In *Pattison* v. *Pattison*, 301 N.Y. 65, 73–74, 92 N.E. 2d 890, 895 (1950), the Court of Appeals said:

> A conveyance is fraudulent when the grantor, even though solvent, is motivated by an intent to hinder, delay or defraud his creditors. Debtor and Creditor Law, § 276. * * *

Whether or not this actual intent existed is a fact question, provable by circumstantial evidence. *Altman* v. *Finkel*, 268 App. Div. 666, 52 N.Y.S. 2d 634 (1945), reargument denied 269 App. Div. 745, affd. 295 N.Y. 651, 64 N.E. 2d 715.

Petitioner correctly contends that the fraud existing when there is a willful failure to report income can exist whether or not there is also a fraudulent transfer. There is no dispute that either a fraudulent omission of income or a fraudulent transfer of property

---

[6] SEC. 1119. [I.R.C. 1939] PROVISIONS OF SPECIAL APPLICATION TO TRANS-FEREES.

(a) BURDEN OF PROOF.—In proceedings before the Board the burden of proof shall be upon the Commissioner to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax.

[7] Sec. 276. Conveyance made with intent to defraud

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. * * *

can occur without the other. Respondent relies primarily on the findings of fraud made in the prior cases.

In New York a voluntary conveyance without consideration made by a debtor while indebted to the complaining creditor constitutes a prima facie case of actual fraud. *Sabatino* v. *Cannizzaro*, 243 App. Div. 20, 275 N.Y.S. 677 (1934); *Cregg* v. *Electri-Craft Corporation*, 175 Misc. 964, 25 N.Y.S. 2d 920 (1941). Any voluntary conveyance hindering or delaying the creditor is forbidden in New York. *Rose* v. *Rose*, 241 App. Div. 3, 271 N.Y.S. 5 (1934).

Petitioner has offered no evidence rebutting the prima facie case of fraud. Since the transfers involved here were made without consideration while the transferors were indebted,[8] they are prima facie fraudulent and respondent has met his burden of proof. We find that the transfers at issue here were fraudulent as to creditors within the purview of section 276 of the New York Debtor and Creditor Law.

Inspection of the salient facts also strongly supports our findings of fraudulent intent in each docket number. In the prior cases it was found that Samuel (1) failed to report sales made by NTC under various names with intent to evade taxes, (2) made false bookkeeping entries to prevent NTC from reporting sales made in its name, and (3) paid sales proceeds directly to himself and Esther.

During the years in question Samuel and Esther controlled NTC, and at all times either he or Esther owned all of its stock. The actions intended by NTC were those intended by Samuel and, until her death, by Esther. Both the transferor, a corporation wholly owned by the transferees, and the transferees themselves fraudulently failed to report the transfers with the intent to evade tax. Esther died in March 1944 owing taxes because of her and Samuel's very acts involved in these and in the prior cases. Samuel became executor of her estate and later distributed its residuum to himself without paying such taxes. The accumulation of all the foregoing circumstances is clearly enough to sustain respondent's burden of proof. The nonreporting of a transfer, which nonreporting by both transferee and transferor gives rise to additions to tax for fraud, is strong evidence in itself as to Docket Nos. 69931 and 69932 that the transfers themselves were intended to hinder, delay, and defraud the tax collectors.

Other facts support a finding of actual fraud. Resulting insolvency, while not essential to actual fraud, does reveal and indicate that the transfers left the creditor with fewer assets from which to satisfy his claim. Finally, no fraud could have been determined by the prior cases against Esther's estate and Samuel had there

---

[8] We need not decide when NTC became insolvent, although it was so at the conclusion of the transfers involved herein.

been no transfers to them. Although fraudulent omissions of income and fraudulent transfers need not be found together, we so find them here.

We find petitioner liable as transferee to the extent determined (the amount of interest will be discussed *infra*) in all docket numbers now before us because of actual intent to defraud creditors in each. We similarly sustain respondent's determination that the transfers from NTC to Esther involved in Docket No. 69931 were made with actual intent to defraud creditors, and that Esther is liable as transferee thereof. The extent of liability of petitioner as transferee of Esther in this latter docket will be determined in Issue 6, *infra*.

Our resolution of Issue 2 renders unnecessary consideration of respondent's alternative bases of transferee liability as propounded in Issues 3 and 4.

### Issue 5.

Petitioner contends that we should allow equitable recoupment in Docket No. 69932 to the extent of $44,992,[9] the amount of Samuel's taxes and additions to tax for the years 1944 and 1945, which have been paid. It is clear that Samuel's liability for taxes and additions thereto and the transferee liability of his estate, petitioner herein, arose from the same transactions. Petitioner claims that if all payments made from NTC to Samuel are recovered in this proceeding, it would be unfair and unjust to allow respondent to retain taxes on income reported by Samuel.

Conceding the underlying validity of this argument of unfairness, we nevertheless believe that petitioner has misunderstood its remedy. This Court has steadfastly through the years held itself without jurisdiction to apply the doctrine of equitable recoupment. *Commissioner* v. *Gooch Co.*, 320 U.S. 418 (1943); *Wiener Machinery Co.*, 16 T.C. 48 (1951).

Petitioner, grossly misinterpreting the holding in *Flora* v. *United States*, 362 U.S. 145 (1960), urges us that this decision enables us to expand our own jurisdiction, a novel concept in the field of jurisprudence. *Flora* held merely that full payment is required to enable a taxpayer to sue for a refund in a Federal District Court. Although that court has broad equity powers,[10] we do not, and if it is unfair to require a taxpayer to pay his deficiency in full prior to having his claim determined on the merits before a court with full equity jurisdiction, such unfairness is for Congress to remedy.

Even if this Court could grant equitable relief to petitioner under certain circumstances, we could not do so in this case. A basic

---

[9] We have found petitioner liable in that docket for an amount in excess of this sum. Issue 2, *supra*.

[10] In instances where section 1341 (discussed *infra*) is inapplicable, District Courts have permitted equitable recoupment, subject to equitable defenses such as unclean hands. Cf. *United States* v. *Bowcut*, 287 F. 2d 654 (C.A. 9, 1961).

requirement for equitable relief has always been the inadequacy of the remedy at law. Congress has provided petitioner a remedy superior to and inclusive of equitable recoupment and we reject petitioner's argument that this provision, section 1341 of the Internal Revenue Code of 1954, does not apply.

Consonant with our holding on Issue 1, Congress too has recognized the consistency of taxing payments when received under a claim of right, although later those payments were restored under a superior right. Prior to 1954, taxpayers having to restore such payments were entitled to a loss deduction in the year repayment was made. *United States* v. *Lewis*, 340 U.S. 590 (1951). Cf. *Healy* v. *Commissioner, supra; North American Oil* v. *Burnet, supra.*

As a reaction to the *Lewis* case, Congress enacted section 1341 [11] in 1954 and explained its purpose as follows:

If the taxpayer included an item in gross income in one taxable year, and in a subsequent taxable year he becomes entitled to a deduction because the item or a portion thereof is no longer subject to his unrestricted use, and the amount of the deduction is in excess of $3,000, the tax for the subsequent year is reduced by either the tax attributable to the deduction or the decrease in the tax for the prior year attributable to the removal of the item, whichever is greater. Under the rule of the *Lewis* case (340 U.S. 590 (1951)), the taxpayer is entitled to a deduction only in the year of repayment.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Whenever the decrease in tax for the prior year is greater than the tax for the taxable year (without the deduction attributable to the item in question), the excess is treated as a payment of tax on the last day prescribed by law for payment for the taxable year and will be refunded or credited as an overpayment for that year.

H. Rept. No. 1337, 83d Cong., 2d Sess., pp. A294–A295 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 451–452 (1954). The pro-

---

[11] SEC. 1341. COMPUTATION OF TAX WHERE TAXPAYER RESTORES SUBSTANTIAL AMOUNT HELD UNDER CLAIM OF RIGHT.

(a) GENERAL RULE.—If—

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000, then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

(4) the tax for the taxable year computed with such deduction; or

(5) an amount equal to—

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

\*　　\*　　\*　　\*　　\*　　\*　　\*

(b) SPECIAL RULES.—

(1) If the decrease in tax ascertained under subsection (a)(5)(B) exceeds the tax imposed by this chapter for the taxable year (computed without the deduction) such excess shall be considered to be a payment of tax on the last day prescribed by law for the payment of tax for the taxable year, and shall be refunded or credited in the same manner as if it were an overpayment for such taxable year.

visions of this statute provide for as complete relief as would be available to petitioner under equitable recoupment, and seem expressive of a congressional desire to allow recoupment in cases such as the instant one. We therefore conclude that equitable recoupment is unavailable in cases to which section 1341 applies.[12] The question of what relief may be afforded petitioner under section 1341(b)(1) is not before us in this case.

In furtherance of the claim for equitable recoupment, petitioner argues that section 1341 is inapplicable to related taxpayers, contrasting it with section 1311 *et seq.*, and claims to be a taxpayer "related to" Samuel. Without deciding what import the omission of a section comparable to section 1313(c)[13] from section 1341 has, we conclude that Samuel's estate is encompassed within the term "the taxpayer" as it appears in section 1341.

It is clear that with respect to taxes due from or owing to a deceased taxpayer, his estate is treated as his successor in interest. If a taxpayer restored funds received under claim of right and died, his estate could obtain the tax credit provided in section 1341 on behalf of the taxpayer. Since an estate is liable for its decedent's taxes, it is also entitled to credits owing to the decedent. We therefore find that a taxpayer's estate is entitled to the relief afforded by section 1341 if all the other requirements of that provision have been met.

*Issue 6.*

Although the legal principles involved in ascertaining the date from which interest runs and at what rate are the same in all dockets, those dockets asserting liability as transferee of the Estate of Esther M. Stein present a preliminary problem. On August 21, 1946, Samuel received $74,880.91 as residual legatee under Esther's will. Petitioner concedes liability for this amount under Docket No. 70277, but denies liability for interest thereon (or in the alternative, interest from the date of demand at 4 percent[14] per annum). There is no dispute that petitioner's total liability (excluding potential interest liability) as transferee of the estate of Esther is $74,880.91, the amount received from that estate. The preliminary issue is under which docket or dockets this liability is to be assessed.

Petitioner also seeks to allocate the entire liability as transferee of Esther's estate to Docket No. 70277, because of his estoppel argument as to Docket No. 69931. We would assume that since the deficiency in the latter docket was asserted first, the $74,880.91 should be allocated

---

[12] We need not decide the effect of the fraud found in the prior cases and that found herein upon petitioner's right to equitable relief.

[13] Sec. 1313(c) defines related taxpayers, and includes a decedent and a decedent's estate. Sec. 1311 *et seq.*, apply to taxpayers and related taxpayers.

[14] Petitioner claims to be a constructive trustee, and as such bound to invest in "legals" yielding 3- to 4-percent return.

first to it and then to Docket Nos. 70277 and 78991, respectively. However, respondent agrees that the payment from the estate of Esther may be applied to Docket Nos. 70277, 78991, and 69931, in that order. We adopt respondent's concession, and find petitioner liable as transferee of the estate of Esther in Docket Nos. 70277 and 78991 in the amounts determined therein, together with interest as determined below.

We therefore find petitioner in Docket No. 69931 liable as transferee of the estate of Esther as transferee of NTC in the amount of $15,979.16, the funds received from her estate in excess of the deficiencies in Docket Nos. 70277 and 78991. In Docket No. 69932 we have found petitioner liable as transferee of NTC in the amount of $115,167.41. These sums, totaling $131,146.57 (excluding interest), exceed NTC's liabilities, now $125,627.83 (excluding interest). Proper adjustment to petitioner's liability as transferee of NTC and as transferee of a transferee of NTC will be made in the Rule 50 computation.

*Issue 7.*

Having determined the existence of liability on all dockets herein presented, we now ascertain the applicable rate and starting date of the running of interest upon the various transfers. We must first determine the proper law to be applied.

The United States Supreme Court has recently held that the existence and extent of transferee liability is determined by State law. *Commissioner* v. *Stern, supra.* A necessary corollary to this holding is that section 311 [15] of the Internal Revenue Code of 1939 does not create transferee liability, but merely provides a procedural device for collection once transferee liability has been established. We must decide whether State or Federal law determines the existence and extent of interest on the transferred assets from the date of transfer to the date of the notice of deficiency sent by the respondent. Section 6601 of the Internal Revenue Code of 1954 provides for interest on all deficiencies thereafter.

The Fifth Circuit recently faced this very question in *Patterson* v. *Sims*, 281 F. 2d 577 (C.A. 5, 1960). That case held that State law determines the existence and extent of the interest liability of a transferee from the time of transfer to the date notice of deficiency is sent to the transferee. The basis for this result is that respondent in a

[15] SEC. 311. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter * * *:

(1) TRANSFEREES.—The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter.

transferee case is in the position of a creditor of the transferor under State law, and if such creditor cannot collect interest under State law, respondent cannot do so here. The court also stated that upon sending the notice of deficiency to the transferee, respondent is entitled to interest thereon just as he is so entitled on any deficiency. See sections 6601 and 6901, I.R.C. 1954, and their 1939 Code counterparts, sections 294(b) and 311.

We agree with the reasoning of the Fifth Circuit. We are aware of seemingly contrary results, the foremost of which is *Voss* v. *Wiseman*, 234 F.2d 237 (C.A. 10, 1956). Although interest was denied respondent on the theory of res judicata, the court in strong dicta based transferee liability on the theory of damages under Federal law. These damages were based on the retention of the assets after demand (in the form of a notice of deficiency). Therefore the court implied that had respondent not been barred from collecting any interest, he would have recovered interest only from the date of demand.

The *Voss* case was followed in *Pallister* v. *United States*, 182 F. Supp. 720 (S.D.N.Y. 1960). The District Court recognized that the question was "highly debatable," and held that where the transferee's good faith is unchallenged, interest runs only from the notice of the debtor-creditor relationship between himself and the Government. The case does not control here since the good faith of the transferee is nonexistent, and because the case does not consider the possible relevance of State law.[16]

Prior to the decision in *Voss* v. *Wiseman*, *supra*, many decisions had based the rate of the transferee's interest liability, prior to the issuance of a notice of deficiency to the transferee, on State law when the transferred assets were insufficient to pay the transferor's tax liabilities. In *United States* v. *Snook*, 24 F. 2d 844 (N.D. Ga. 1928), reversed on other grounds sub nom. *Austin* v. *United States*, 28 F.2d 677 (C.A. 5, 1928), interest was assessed at a rate of 7 percent from the fair average date of receipt of the assets, without mention of the source of such rate. In *Henry Cappellini*, 16 B.T.A. 802 (1929), we held a transferee liable for interest at the legal rate in Pennsylvania from the date of transfer. This rule was followed in *Edward H. Garcin*, 22 B.T.A. 1027 (1931), and in *Frederick L. Watson*, 25 B.T.A. 971 (1932). In *A. D. Saenger*, 38 B.T.A. 1295 (1938), it was not deemed necessary to discuss this seemingly well-established rule. The decisions in *Voss* and *Pallister* necessitate reexamination of the above-named cases.

---

[16] In *United States* v. *Shepard's Estate*, 196 F. Supp. 281 (N.D. N.Y., 1961), *Pallister* was followed, again involving a transferee in good faith which would be constructive as opposed to actual fraud if any fraud existed. In *Shepard* the transferee was the estate of the transferor.

The situation in the above cases and in the cases before us must be distinguished from that which we faced in *Leo L. Lowy*, 35 T.C. 393 (1960). In *Lowy* approximately $187,000 of taxes and additions to tax was owed by the transferor, and the transferee received over $1 million of assets of the transferor. We held that Federal law determined the running of interest. We said at page 395 that:

> The confusion engendered by petitioner's position grows out of a situation where the amount of the transferred assets is less than the amount of the creditor's claim, and where, in order to make the creditor whole, it may be necessary to find some liability against the transferee *for interest in respect of the transferred assets.* Such interest, by its very nature, can arise only under State law, and must comply in every respect with applicable State law not only as to rate, but also as to the starting point. Thus, if the transferred assets herein had been equal to only $100,000, substantially less than the amount of the basic deficiencies, they would plainly have been insufficient to satisfy the Government's claim. However, in such circumstances, the transferee would have had the use of the transferred assets over a period of time, and it is quite possible that he would be liable, under State law, for interest, not on the Government's claim against the transferor, but on the amount of the transferred assets, measured from a point of time that would not be earlier than the date of transfer.

The distinction between *Lowy* and cases such as the instant ones is in the nature of the interest being charged. In cases where the transferred assets exceed the total liability of the transferor, the interest being charged is upon the deficiency, and is therefore a right created by the Internal Revenue Code. However, where, as here, the transferred assets are insufficient to pay the transferor's total liability, interest is not assessed against the deficiencies because the transferee's liability for such deficiencies is limited to the amount actually transferred to him. Interest may be charged against the transferee only for the use of the transferred assets, and since this involves the extent of transferee liability, it is determined by State law. *Commissioner v. Stern, supra.*

Reinforced by *Stern* and by *Patterson* v. *Sims, supra*, we extend the principle underlying the decisions discussed above to hold that where a tranferee receives assets insufficient to satisfy the transferor's tax liabilities,[17] determination of the existence, starting date, and rate of interest upon the retention of those assets prior to demand therefor is controlled by State law.[18]

---

[17] Subsequent to Samuel's death, part of NTC's liabilities has been paid. See Issue 6, *supra.*

[18] The legislative history, although not of sufficient clarity for judicial reliance, tends to support the running of interest on transferee liability from the date of transfer, although in 1926 the issue resolved in *Stern* was not considered. The Senate wished to insert into the then section 280 a provision expressly forbidding the running of interest against a transferee on the sum received. S. Rept. No. 52, 69th Cong., 1st Sess., pp. 18–20 (1926), 1939–1 C.B. (Part 2) 354–355. This provision was deleted in conference. H. Rept. No. 356, 69th Cong., 1st Sess., p. 5 (1926).

962

Under New York law, applicable herein, interest on a conveyance voidable because of constructive fraud runs from the date of demand by the creditor, but where actual fraud exists, interest runs from the date of the fraudulent conveyance.[19] *Mac Intyre* v. *State Bank of Albany*, 307 N.Y. 630, 120 N.E. 2d 832 (1954); *Doyle* v. *Levy*, 3 A.D. 2d 908, 162 N.Y.S. 2d 714 (1957) (both cases involving constructive fraud).

In cases involving fraudulent conveyances of land, New York has followed the prevailing view and held a grantee who participated in the fraud chargeable with rents and profits from the date of transfer. *Loos* v. *Wilkinson*, 110 N.Y. 195, 18 N.E. 99, 103 (1888). See Annot., 60 A.L.R. 2d 600. The doctrine has been extended to charging the fraudulent grantee with the fair rental value of the land from the date of transfer where no rents and profits were actually received. *Salt Springs Nat. Bank* v. *Fancher*, 92 Hun. 327, 36 N.Y.S. 742 (1895). We perceive no basic difference between rents from land and interest on capital, and considering the cases just cited together with the clear implications of the *Mac Intyre* case we conclude that New York would charge interest from the date of the fraudulent transfer when both parties thereto are guilty of actual fraud.

We therefore conclude that petitioner is liable for interest at 6 percent as prescribed by New York law from the date of the transfer. N.Y. Gen. Bus. Law, sec. 370.

As to Docket No. 69932, interest will run at 6 percent from the fair average date of receipt. *Henry Cappellini, supra*. Respondent has determined that these dates for the years 1944, 1945, and 1946 are June 30 of each year. These determinations are presumptively correct, and since petitioner has not advocated alternative dates, we adopt those proposed by respondent.

*Decisions will be entered under Rule 50.*

---

[19] The Alabama law as applied in *Patterson* v. *Sims*, 281 F. 2d 577 (C.A. 5, 1960), is identical.